UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| KYLE ROBERT VALLEROY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:14-CV-1657 (CEJ) |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On August 5, 2011, plaintiff Kyle Robert Valleroy filed an application for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of July 9, 2011. (Tr. 124–25). After plaintiff's application was denied on initial consideration (Tr. 74–79), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 82–83).

Plaintiff and counsel appeared for a hearing on February 19, 2013. (Tr. 41–65). The ALJ issued a decision denying plaintiff's application on April 25, 2013. (Tr. 16–32). The Appeals Council denied plaintiff's request for review on July 21, 2014. (Tr. 1–6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

In the Disability Report plaintiff completed on August 19, 2011 (Tr. 153–60), he listed his medical conditions as excess pain due to the wearing of his chest wall, two stomach surgeries since 2009 that had created uncontrollable pain, and acid reflux. Plaintiff was born in 1981 and was 30 years old on the alleged onset date of his disability. At the end of the report, plaintiff remarked that all of his past jobs were labor intensive and he "in no way" could do any of those jobs or jobs like them because of the pain he had since his surgeries. (Tr. 160). In the Disability Report prepared for his appeal on December 13, 2011 (Tr. 186–90), plaintiff reported no new physical or mental limitations and no change for better or worse since his last report.

In his Work History Report dated August 30, 2011 (Tr. 161–72), plaintiff indicated that he had worked for a waste management company from May 2007–July 2011, as a truck driver from October 2006–May 2007, at a quick lube shop from May 2000–December 2006, and at a pharmaceutical company from July 2000–August 2001. When he worked for the waste management company, he worked 50 hours a week and frequently lifted 75–80 pounds by himself. In his positions as a truck driver, he loaded and unloaded trailers 50 hours a week and frequently lifted 50 pounds or more. In his maintenance position at the quick lube shop, he worked 60 hours a week and changed oil, radiator flushes, and air filters in vehicles. Plaintiff worked full-time in the shipping department of the pharmaceutical company, which consisted of walking, bending, twisting and lifting the entire shift. In a Work Activity Report dated August 9, 2011 (Tr. 142–49), plaintiff stated that he stopped working for the waste management company because of his medical condition.

In the Function Report plaintiff completed on August 30, 2011 (Tr. 173–83), he described his daily activities as mostly laying on the couch and doing light house work, such as washing dishes or folding laundry. He tried to "take it as easy as possible" because of his pain and estimated that house work took him about six hours to complete. (Tr. 173, 175). Plaintiff wrote that his wife and children helped him with the house cleaning and caring for their dogs. (Tr. 175). He did not report any problems with his personal care or the need for reminders to take his medication. He stated that his pain was so severe that it interfered with his ability to fall asleep. Prior to his conditions, plaintiff wrote that he was able to lift things, walk without hurting, play outside with his children, and perform all of his work duties.

Plaintiff also reported that he could drive a car and go shopping. (Tr. 176). He would shop for groceries once every couple of weeks with his wife, since he needed help lifting and carrying. He could not be in the store for more than 30 minutes before his pain became intolerable. Plaintiff wrote that he was able to pay bills, use a checkbook, handle a savings account, and count change. His hobbies and interests included playing sports or games with his children and camping. However, he stated he no longer did these activities due to his conditions. Plaintiff did not regularly engage in social activities, but did not report any problems getting along with others.

With respect to his physical abilities, plaintiff noted that his conditions affected his ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, complete tasks, and use his hands. (Tr. 178). He stated that he could not do any of these functions because "the pain gets so bad" and made him faint. Plaintiff

could walk about half a block before he needed a rest, and he sometimes needed a few hours before he could resume while he waited for his pain medication to work. He had no problems following written or spoken instructions or getting along with authority. Plaintiff also was capable of handling stress and changes in routine. As of January 24, 2013, the medications plaintiff reported using included Exalgo[1] 32 mg one tablet per day, Oxycodone[2] 10/325 mg two tablets three times a day, Clonazepam[3] 1 mg, Nortriptyline[4] 50 mg two tablets per day. (Tr. 198).

## B. Testimony at the Hearing

At the hearing on February 19, 2013, plaintiff testified that his average day involved lying on the couch and reading or watching television. (Tr. 47, 51). The "most extensive part" of his day was taking his dogs outside and hooking them onto a leash beside the door. (Tr. 47). Plaintiff only engaged in limited activity, because of pain in his left stomach and nerve damage in his lower back. He stated that it took him a couple of minutes to sit up and then a few more minutes to stand up because of the pain in his back and stomach. Plaintiff testified that a second surgery on his stomach had helped with his acid reflux but tore up nerves in different locations and put stress on his back causing problems with three discs. Plaintiff did not think he could do even sedentary work because remaining in the sitting-up position for a few hours made him feel faint and had caused him to black out several times from the pain of pinching nerves.

---

[1] Exalgo is the prescription name for Hydromorphone, an extended-release opiate analgesic used to relieve severe pain around-the-clock.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682013.html (last visited August 11, 2015).
[2] Oxycodone is an extended release opiate analgesic used to relieve moderate to severe pain around-the-clock.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html (last visited August 11, 2015).
[3] **Error! Main Document Only.**Clonazepam, or Klonopin, is a benzodiazepine prescribed for treatment of seizure disorders and panic disorders.  See Phys. Desk Ref. 2782 (60th ed. 2006).
[4] **Error! Main Document Only.**Nortriptyline is a tricyclic antidepressant.  http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682620.html (last visited on May 25, 2010).

For pain management, plaintiff reported that he was taking medicine and had tried several different injections into his nerves, but none of the treatment worked for any amount of time. He stated that no other surgery was available for his stomach, "so I'm stuck dealing with it." (Tr. 50). Plaintiff lived with his wife and two children, but stayed at home by himself during the day while they went to work and attended school. He sometimes ate a bowl of cereal for breakfast and a sandwich for lunch, but most of the time he did not eat anything because of the pain. (Tr. 51). If he was lucky, he slept a couple of hours each night.

Based on a medical source statement from his treating physician about which the ALJ inquired at the hearing, plaintiff acknowledged that he could stand four hours during an 8-hour work day at 30 minute intervals and sit for six hours for two hours at a time, but this was the most he could do in a single day and not every day. (Tr. 52, 55). With respect to the pain medications he took, he stated that they took him from a 10 to a 4 on a 10-point pain scale, but the pain was never completely gone. The relief he experienced from the medication lasted for two hours at most. (Tr. 53). The only side effect he had from the medications was dizziness. Plaintiff reported specifically having constant pain on the left side of his stomach right underneath the rib cage. (Tr. 54). The pain was sharp and stabbing. Bending over to tie his shoes was difficult for plaintiff because of the pain.

Dale A. Thomas, a vocational expert, provided testimony regarding the employment opportunities for an individual of plaintiff's age, education and work experience. (Tr. 55–62). Mr. Thomas first classified plaintiff's vocational history, which involved medium to heavy semi-skilled or unskilled work. Plaintiff testified that he had completed the twelfth grade. The first hypothetical the ALJ posed to

the vocational expert was of a person who could engage in sedentary work, stand or walk for up to 30 minutes at a time for two hours a day, sit continuously for up to two hours at a time for a total of six hours a day, push and pull a total of one hour in an 8-hour work day for five minutes at a time, occasionally bend and reach, frequently kneel, should have no more than moderate exposure to heights, machinery and fumes, and avoid all exposure to vibration and concentrated exposure to temperature extremes. (Tr. 59). The vocational expert testified that such a person would not be able to do any of plaintiff's past work, but could perform work as a creditor authorizer, also known as a call out operator, at the unskilled, sedentary level.

The ALJ next asked the vocational expert how many unplanned or unscheduled absences an employer would tolerate of a call out operator. Mr. Thomas testified that the total tolerable number of days a person could be absent from that job would be 10 working days per year. Being absent two days a month or being off-task 20 percent of the time would preclude the work. After the completion of the vocational expert's testimony, the ALJ asked plaintiff additional questions about his reaching ability. Plaintiff testified that when he attempted to reach, it triggered nerves on his left side under his ribs and created a stabbing pain. Plaintiff stated that most of his pain derived from sitting upright, standing, leaning forward or more major movement than simply moving his hands or fingers. (Tr. 64). He testified that there was no cure for his pain and nothing medical providers could do except treat it with medication.

### C. <u>Medical Records</u>

On August 18, 2009, plaintiff had a consultation with L. Michael Brunt, M.D., at Barnes Jewish Hospital for possible fundoplication[5] for his gastroesophageal reflux disease (GERD).[6]  (Tr. 334–35).  Plaintiff reported that he started having reflux problems thirteen years earlier.  He had tried taking "just about everything acid-suppression wise" and his symptoms had worsened over the last five years.  Plaintiff reported having heartburn, frequent regurgitation, and water brash.  Dr. Brunt noted that plaintiff had had an upper endoscopy,[7] which showed grade C esophagitis,[8] Barrett's[9] without dysplasia, and a hiatal hernia.[10]  Additionally, esophageal pH testing[11] was markedly abnormal.  Plaintiff reported drinking two 20- or 32-ounces of soda per day, but stated that he had severe reflux symptoms regardless of whether he drank soda.  A review of his social history indicated that plaintiff smoked ½ pack of cigarettes a day.  A physical examination indicated that plaintiff was moderately overweight.  Because plaintiff had significant GERD symptoms that were not well-controlled medically, Dr. Brunt concluded that plaintiff

---

[5] Fundoplication is a surgery that prevents stomach contents from returning to the esophagus and thereby preventing the symptoms of GERD by wrapping the upper portion of the stomach around the lower portion of the esophagus.
http://www.gikids.org/files/documents/digestive%20topics/english/Fundoplication.pdf (last visited August 12, 2015).
[6] Gastroesophageal reflux disease (GERD) occurs when a muscle at the end of the esophagus does not close properly, allowing stomach contents to reflux into the esophagus and irritate it.
http://www.nlm.nih.gov/medlineplus/gerd.html (last visited August 12, 2015).
[7] An endoscopy is a procedure by which a tiny camera is attached to a long, thin tube that allows a doctor to move through a body passageway or opening to examine the inside of an organ.
http://www.nlm.nih.gov/medlineplus/endoscopy.html (last visited August 12, 2015).
[8] Esophagitis refers to any inflammation, irritation, or swelling of the esophagus.
http://www.nlm.nih.gov/medlineplus/ency/article/001153.htm (last visited August 12, 2015).
[9] Barrett's esophagus is a condition in which the lining of the esophagus is damaged by stomach acid and becomes similar to intestinal tissue.  http://www.niddk.nih.gov/health-information/health-topics/digestive-diseases/barretts-esophagus/Pages/definition-facts.aspx (last visited August 12, 2015).
[10] A hiatal hernia is a condition in which the upper part of the stomach bulges through an opening in the diaphragm, making it easier for acid to reflux.
http://www.nlm.nih.gov/medlineplus/hiatalhernia.html (last visited August 12, 2015).
[11] Esophageal pH monitoring measures how often stomach acid enters and remains in the esophagus.
http://www.nlm.nih.gov/medlineplus/ency/article/003401.htm (last visited August 12, 2015).

was a candidate for laparoscopic hiatal hernia repair[12] and fundoplication.  Dr. Brunt informed plaintiff that his soda intake and his weight were risk factors for his condition.  After explaining the risks of surgery, Dr. Brunt scheduled plaintiff for the fundoplication on September 24, 2009.

Dr. Brunt conducted the laparoscopic Nissen fundoplication as scheduled on September 24, 2009 without complications, and plaintiff was discharged in stable condition.  (Tr. 331–33).  At a post-surgery follow-up with Dr. Brunt on December 2, 2009, plaintiff had a normal barium esophagram.[13]  (Tr. 323).  On January 29, 2010, plaintiff had a complete abdominal sonogram for midline-upper abdominal pain that indicated mild hepatic steatosis,[14] but the sonogram was otherwise normal.  (Tr. 319).

Plaintiff was examined by Jeremy Leidenfrost, M.D., and Dr. Brunt at Barnes Jewish Hospital on January 18, 2011.  (Tr. 204–05).  Plaintiff had been having ongoing problems which chest pain, which increased with moving and lifting.  His reflux had greatly improved since his fundoplication, but his chest pain was bothering him more post-surgery.  Since his surgery, he was back at work full-time at his sanitation job and frequently lifted weights of approximately 100 pounds. Plaintiff described his chest pain as constant and sometimes so severe that it limited his activity.  He had tried acid suppression but experienced no benefit.

---

[12] Laparoscopic hiatal hernia repair is an anti-reflux surgery for GERD by which a thin tube with a camera is inserted into an incision and the surgeon conducts the repair from a monitor in the operating room.  http://www.nlm.nih.gov/medlineplus/ency/article/002925.htm (last visited August 12, 2015).
[13] An esophagram is a radiology test that evaluates the esophagus. http://www.nationaljewish.org/programs/tests/imaging/barium-swallow-study/ (last visited August 12, 2015).
[14] Hepatic steatosis, or fatty liver disease, is a common liver complication caused by a liver metabolism that results in the accumulation of fat.  http://www.ccfa.org/resources/liver-disease-and-ibd.html (last visited August 12, 2015).  "Because it is a fairly minor problem and causes no symptoms, it generally does not require any treatment."  Id.

Earlier that day, plaintiff had had a barium swallow esophagram that showed a small part of his posterior wrap from the fundoplication had herniated through the diaphragm. (Tr. 210–11, 314–15). Otherwise, plaintiff's gastroesophageal junction appeared to be in a normal anatomic position. Dr. Brunt suspected that the herniation was the likely cause of plaintiff's symptoms and thought that a reoperation was the best option for plaintiff. The doctors explained the risks and benefits of a redo fundoplication to plaintiff, including that he would likely be on activity restrictions for three months following the operation, and plaintiff was willing to proceed. Before the operation, the doctors obtained a manometry test[15] to ensure plaintiff's motility was normal. (Tr. 306–10).

On February 16, 2011, Dr. Brunt performed the redo laparoscopic hiatal hernia repair and fundoplication with lipid barrier-coated mesh to reinforce plaintiff's crural closure. (Tr. 212–14, 289–95). There were no complications from the surgery, and plaintiff was discharged in stable condition. Plaintiff underwent a water-soluble contrast and barium esophagram post-surgery the next day. (Tr. 296–97). The results of the examination showed no gastrointestinal leak with the gastroesophageal junction presently laid below the level of the diaphragm, no hiatal hernia, and a normal stomach. One month after the second surgery, plaintiff was doing very well and felt much better than he had after the first operation. (Tr. 203). His symptom scores were all zero except for a slight difficulty swallowing solid food, which Dr. Brunt wrote was not unexpected. Plaintiff was not using any acid suppression, was not having much pain either, and did not have nausea. Overall, Dr. Brunt was very pleased with how plaintiff was doing. The doctor told

---

[15] An esophageal manometry measures how well the esophagus is working.
http://www.nlm.nih.gov/medlineplus/ency/article/003884.htm (last visited August 12, 2015).

plaintiff he could gradually increase activity, but Dr. Brunt would not release plaintiff to go back to work for another four weeks since he knew plaintiff frequently engaged in heavy lifting at work. Plaintiff was instructed to follow-up with Dr. Brunt in one year.

Plaintiff had another barium swallow esophagram on July 26, 2011, which indicated expected post-operative anatomy post-fundoplication. (Tr. 208–09, 283–84). Plaintiff called the hospital the next day, anxiously asking about how long he should stay off work. (Tr. 202). The normal findings of plaintiff's esophagram were discussed with him, and he was told that the doctor would not normally restrict his work activity at this point. However, plaintiff was told that if he felt he was in too much pain to work, the hospital could provide him a statement to keep him off work longer while he underwent further evaluation with Dr. Sayuk. The hospital also discussed with plaintiff the possibility that his job could be impacting his pain since he regularly lifted heavy objects. Plaintiff was told that he might require a multidisciplinary effort to manage his symptoms, which could include regular appointments with Dr. Brunt, a pain management doctor, a gastroenterologist, and an internist. Plaintiff indicated that he understood and scheduled an appointment with Dr. Sayuk for August 30th.

On August 18, 2011, plaintiff went to the emergency room at Mercy Hospital for chest pain and shortness of breath. (Tr. 216–29). He stated that his symptoms had been ongoing for two or three days and were constant in nature. His pain was sharp, he felt as if his throat was closing up, and the shortness of breath was worse when he exerted himself or took a deep breath. It was noted that plaintiff had smoked one-half pack of cigarettes a day for fifteen years, but reportedly quit

smoking eight days earlier. Lab tests, blood tests, a CT angiography of his chest, and an EKG were normal. Plaintiff was administered sodium chloride, a Toradol[16] injection 30 mg, and two Percocet[17] 5-325 mg tablets. He was instructed to start taking docusate sodium[18] 100 mg twice a day and Oxycodone[19] 10 mg every four hours as needed for pain and to follow-up with Sean McIntosh, D.O. in one week.

Plaintiff attended his scheduled appointment with Dr. Sayuk at the Gastroenterology Center of Washington University School of Medicine on August 30, 2011. (Tr. 252–55). Plaintiff identified his medical problems as sharp pains on the left side of his stomach, chest pains, and trouble eating and digesting food. His accompanied symptoms included shortness of breath, stomach pains, dizziness, fainting, numbness or tingling, and difficulty sleeping. Plaintiff dated his related symptoms back to the age of 11 or 12. He reported that his chest pain and epigastric discomfort were provoked by heavy lifting related to his job as a "trash tosser" and also were worsened by solid food consumption. He had not had any weight loss, but experienced nausea in association with the pain. Plaintiff told Dr. Sayuk that his redo fundoplication seemed to have helped his chest pain symptoms for a few months before they recurred. Dr. Sayuk noted that his present concern would be for a possible recurrence of plaintiff's hernia, but a recent barium swallow test failed to demonstrate any evidence of hernia recurrence. Dr. Sayuk thought

---

[16] **Error! Main Document Only.**"Toradol is "a trademark for preparation of ketorolac tromethamine," which is "a nonsteroidal antiinflammatory drug administered intramuscularly, intravenously, or orally for short-term management of pain[.]" See Dorland's Illustrated Med. Dict. 1966, 998 (31st ed. 2007).

[17] **Error! Main Document Only.**Percocet is a combination of Oxycodone and Acetaminophen. Oxycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain. It can produce drug dependence. See Phys. Desk. Ref. 1114 (60th ed. 2006).

[18] Docusate sodium, also known as Bisacodyn, is a laxative used on a short-term basis to treat constipation. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601027.html (last visited August 12, 2015).

[19] Oxycodone is an extended-release opiate analgesic used to relieve moderate to severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html (last visited August 12, 2015).

plaintiff possibly was experiencing some adhesions or that visceral hypersensitivity[20] was driving plaintiff's symptom experiences. Dr. Sayuk was concerned that plaintiff continued to try to control his pain with Percocet. The doctor recommended that plaintiff undergo an upper endoscopic examination to directly visualize his gastroesophageal junction and the integrity of his fundoplication wrap. In the interim, Dr. Sayuk started plaintiff on Gabapentin[21] 300 mg three times daily as needed for his pain. The doctor hoped the Gabapentin would alleviate some of plaintiff's discomfort without the need for a narcotic analgesia.

On September 9, 2011, Dr. Sayuk conducted an upper gastrointestinal endoscopy of plaintiff. (Tr. 247–48, 273–77). The exam showed esophageal mucosal changes suspicious for a long-segment Barrett's esophagus, which was biopsied. No dysplasia or malignancy was identified in the biopsy of the sample. (Tr. 249–51, 278–49). A Nissen fundoplication was also found in the endoscopy, which appeared to be properly oriented without an associated hernia. The examined duodenum was normal. Based on the examination findings, Dr. Sayuk recommended that plaintiff use a proton pump inhibitor[22] daily for his Barrett's and reflux management, repeat the upper endoscopy in one year for surveillance, and consider using Nortriptyline[4] 25 mg every night for neuropathic pain and visceral hypersensitivity.

---

[20] Visceral hypersensitivity is an enhanced perception or enhanced responsiveness within the gut, even to normal events. http://www.iffgd.org/site/learning-center/glossary#V (last visited August 13, 2015).
[21] **Error! Main Document Only.**Gabapentin is used to help control seizures, to relieve the pain of postherpetic neuralgia, and restless leg syndrome. http://www.nlm.nih.gov/medlineplus/druginfo /meds/a694007.html (last visited on Sept. 1, 2011).
[22] "Proton pump inhibitors (PPIs) are medicines that work by reducing the amount of stomach acid made by glands in the lining of your stomach."
http://www.nlm.nih.gov/medlineplus/ency/patientinstructions/000381.htm (last visited August 13, 2015).

On November 17, 2011, disability examiner Michele Delgado completed a Physical Residual Functional Capacity Assessment for plaintiff. (Tr. 66–71). Based on her review of the medical records, Delgado found that plaintiff could occasionally lift or carry 50 pounds and frequently lift or carry 25 pounds. Plaintiff could stand, walk, or sit for a total of about six hours in an 8-hour workday. Plaintiff was unlimited in his ability to push or pull. Delgado found that plaintiff did not have any postural, manipulative, visual, communicative or environmental limitations. Plaintiff's allegations as to his symptoms were found partially credible, because the medical records on file did not support limitations to the degree alleged.

At a follow-up visit with Dr. Sayuk on November 22, 2011 (Tr. 245–46), plaintiff reported that he continued to experience difficulties with abdominal pain despite the doctor's recommendation to use neuromodulators, including Nortriptyline and Gabapentin. Plaintiff continued to rely on Oxycodone around-the-clock in an attempt to control his pain, which he reported provided him relief. His weight had been stable and his physical examination was normal. Dr. Sayuk wrote that he was unable to identify any clear structural abnormality to account for plaintiff's symptoms from a gastrointestinal standpoint. Functional etiology or possibly a musculoskeletal basis for plaintiff's pain remained considerations. Dr. Sayuk planned to pursue a repeat barium swallow to see if he could detect any anatomical abnormality on radiographic imaging. In the meantime, Dr. Sayuk continued plaintiff on his neuromodulator regimen and refilled plaintiff's Percocet prescription.

The barium swallow esophagram conducted on November 29, 2011 indicated normal post-Nissen fundoplication anatomy. (Tr. 243–44, 268–69). Plaintiff's

swallowing function, esophageal mucosa, esophageal motility, and visualized portions of his stomach were all normal without evidence of a hiatal hernia. A subsequent upper gastrointestinal endoscopy on December 21, 2011 found esophageal mucosal changes consistent with long-segment Barrett's esophagus and a dilated Nissen fundoplication. (Tr. 241–42, 259–63). Dr. Sayuk planned to continue to monitor plaintiff for symptom improvement and to refer plaintiff to Dr. Guarino for pain management recommendations if his symptoms persisted.

Plaintiff had his first appointment with Anthony Guarino, M.D. at Barnes Jewish Hospital for pain management on March 14, 2012. (Tr. 336–39). Plaintiff described his pain to Dr. Guarino as "just below the rib," stabbing, squeezing and crushing, worse with lifting or bending, minimal effect from eating, no response to heat, ice or hot showers, and improved by nothing outside of medications. Plaintiff stated that he only slept 2–3 hours a night, because it was difficult for him to find a comfortable position. He stated that his redo fundoplication had helped him at first, but once he returned to work 6–8 weeks later his symptoms recurred. Plaintiff also reported diarrhea in 95% of his bowel movements. Upon gastrointestinal examination, Dr. Guarino found that plaintiff had a normal abdomen, no masses or tenderness, no hernias, and a normal sounding bowel. Through a motor examination, the doctor noted that plaintiff had full strength throughout and his reflexes were normal. Dr. Guarino indicated that plaintiff's abdominal pain appeared mechanical and deep and attempted to calm his symptoms with a left splanchnic nerve block. The injection provided plaintiff no relief in the office, and Dr. Guarino wondered whether plaintiff's thoracic spine was contributing to his pain. As such, Dr. Guarino ordered a thoracic MRI and prescribed plaintiff opioids. The

doctor would not prescribe plaintiff Lorazepam,[23] noting that plaintiff would need to get previous doctors to write him a prescription if they thought it appropriate. The doctor instructed plaintiff to tell his gastrointestinal doctor that he was experiencing chronic diarrhea as well.

Plaintiff underwent an MRI of his thoracic spine on March 23, 2012, which showed a likely small syrinx within the cervical spine but was otherwise normal. (Tr. 357–38). At a follow-up appointment with Dr. Guarino on April 11, 2012, plaintiff reported no benefit from the splanchnic nerve block, but the opioids had reduced his pain by 90% for 2–3 hours. (Tr. 341–44). He had not yet spoken with his gastrointestinal specialist about his chronic diarrhea, but he had obtained a prescription for Lorazepam from the doctor. Plaintiff reported taking 8–10 Percocet tablets per day, which he tolerated, and currently rated his pain as 7 on a 10-point scale. Since his last visit, his pain had ranged from 1/10 to 10/10, and improved with medication but worsened with increased activity. Dr. Guarino observed that plaintiff had a normal gait. Plaintiff indicated that the pain severely affected his sleep, general activity, normal work and enjoyment of life, but it did not affect his mood or ability to concentrate. Dr. Guarino diagnosed plaintiff with thoracic radiculitis and proceeded to give plaintiff a thoracic epidural steroid injection. Plaintiff had no response to the injection in the office. Dr. Guarino advised plaintiff to change vocations to a job without lifting and change his opioid so he could obtain more sustained relief.

On May 10, 2012, plaintiff reported to Dr. Guarino that he had had a marked period of improvement quantified as 100% relief for one week after the thoracic

---

[23] **Error! Main Document Only.**Lorazepam is prescribed to treat anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682053.html (last visited on Aug. 29, 2007).

epidural steroid injection, and he requested a repeat injection. (Tr. 345–48). His current pain rating was 6/10, but his pain had varied from 0/10 to 10/10 since his last visit. The doctor's physical examination indicated that plaintiff had overly nourished nutrition and a normal gait. Dr. Guarino provided plaintiff another thoracic epidural injection and renewed his Oxycontin[24] and Oxycodone-Acetaminophen[25] prescriptions. At his next appointment with Dr. Guarino on June 21, 2012, plaintiff was not noting much relief from the medications although he did not have side effects from either. (Tr. 349–52). His current pain rating was 8/10, with the least severe being 4/10 and the most severe being 10/10 since his last visit. He reported only 10% relief from the second thoracic epidural injection. Plaintiff described the pain as sharp, stabbing, and constant, improved by lying down and worsened with general activity. Dr. Guarino noted that the level of assistance plaintiff needed at the appointment was minimal-moderate, his mobility was independent and normal, and he was cooperative. Plaintiff stated that he was doing a home exercise program consisting of stretching, walking, and using a bike. Plaintiff had a normal gait and full strength throughout. Plaintiff indicated that he wanted "to get a difference perspective," so Dr. Guarino noted that he would recommend plaintiff to Dr. Margherita. (Tr. 352). Dr. Guarino planned to adjust plaintiff's medications by increasing his prescription for Oxycodone.

At a follow-up appointment with Dr. Guarino on August 21, 2012 (Tr. 353–56), plaintiff stated that he felt his symptoms were progressing. He now felt his

---

[24] **Error! Main Document Only.**OxyContin is indicated for management of moderate to severe pain when a continuous round-the-clock opioid analgesic is needed for an extended period. It is not for use on an as-needed basis. See Phys. Desk. Ref. 2879-80 (65th ed. 2011).

[25] **Error! Main Document Only.**Oxycodone-Acetaminophen is also known as Percocet. Oxycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain. It can produce drug dependence. See Phys. Desk. Ref. 1114 (60th ed. 2006).

pain was worse when he ate food and, in addition, he not only had left upper quadrant symptoms but also back lower quadrant pain described as shooting, aching, sharp, stabbing and constant. His pain improved with medications and lying down, but it worsened with walking or lifting. Plaintiff's mobility was independent and normal at the appointment. His physical examination was normal. Dr. Guarino wrote that he had no other interventions to offer plaintiff at this point, but would continue plaintiff on medications. Plaintiff indicated that his insurance had recently changed, and since he could not obtain his Oxycontin on time he had increased his Percocet dosage on his own. Dr. Guarino ordered a urine drug test and gave plaintiff one week of medications with planned reevaluation in three months.

On August 28, 2012, plaintiff had an upper gastrointestinal endoscopy for a follow-up of his Barrett's esophagus. (Tr. 382–86). Biopsies from his esophageal mucosa found no dysplasia and only mild reflux-like changes. The report from the exam recommended plaintiff repeat the endoscopy in three years for surveillance, continue using a proton pump inhibitor, and follow-up with his treating physicians.

On November 5, 2012, plaintiff sought treatment for his left-sided abdominal pain from Noura Sharabash, M.D., in the Division of Gastroenterology at Washington University School of Medicine. (Tr. 363–77, 404–08). Plaintiff reported that his pain increased with bending, lifting or walking, but improved with ice, a heating pad, lying down and resting. His pain did not change with food or bowel movements, but he previously had experienced epigastric pain after eating. Since

having a cholecystectomy[26] in September 2012, this pain had improved.  In addition, he had had 2–3 months of diarrhea, which did not improve after the cholecystectomy.  Plaintiff reported experiencing reflux about five times a month.  His current medications included Lorazepam, Nortriptyline, Oxycontin, and Oxycodone-Acetaminophen.  He also stated that he had smoked one pack of cigarettes a day for ten years, but quit smoking six months ago.

Upon physical examination, Dr. Sharabash found that plaintiff had tenderness to palpation in all four quadrants of his abdomen and normoactive bowel sounds.  After examining plaintiff's lab results and a CT scan, Dr. Sharabash assessed plaintiff with small bowel thickening, which raised the question of either a localized infection or inflammatory bowel disease.  The doctor planned to investigate with a colonoscopy and endoscopic evaluation of the terminal ileum.  Dr. Sharabash found that plaintiff's abdominal pain as described was consistent with a musculoskeletal etiology and noted that plaintiff had asked her to complete disability paperwork for him.  Based on plaintiff's reflux condition, the doctor wrote that she would consider the addition of a proton pump inhibitor if his symptoms worsened.  Dr. Sharabash also noted that plaintiff's right upper quadrant pain had improved following his cholecystectomy.  The pathology on his gallbladder had been mild, chronic cholecystitis[27] with cholelithiasis.  The doctor also planned to conduct lab testing on plaintiff's elevated liver enzyme to evaluate the etiology.  Plaintiff was instructed to follow-up in three months or sooner if needed.

---

[26] A cholecystectomy is the surgical removal of the gallbladder.
https://www.facs.org/~/media/files/education/patient%20ed/cholesys.ashx (last visited August 13, 2015).
[27] Chronic cholecystitis is swelling and irritation of the gallbladder that continues over time.
http://www.nlm.nih.gov/medlineplus/ency/article/000217.htm (last visited August 13, 2015).

Dr. Sharabash completed a Medical Source Statement for plaintiff as requested after his first appointment with her. (Tr. 360–61). Dr. Sharabash diagnosed plaintiff with musculoskeletal abdominal pain and diarrhea of an unclear etiology. In assessing plaintiff's abilities, she noted that he could frequently lift 6–10 pounds, stand or walk for four hours in an 8-hour workday for 30 minutes at a time, sit for six hours in an 8-hour workday for two hours continuously, and push or pull for one hour per 8-hour workday for five minutes continuously. Plaintiff retained the ability to frequently kneel and finger and occasionally bend, reach and handle. With regard to environmental limitations, plaintiff retained the ability to work in jobs with occasional heights, machinery, fumes, and frequent temperature extremes, but never with vibration. Dr. Sharabash stated that she based her findings on plaintiff's expressed tenderness to palpation throughout his abdomen and plaintiff's description of increased pain with certain activities.

At a follow-up appointment with Dr. Guarino on November 27, 2012, plaintiff stated that the pain was stabbing on the left side of his abdomen at the rib line. (Tr. 388–91). The doctor noted that a diagnosis of Crohn's disease currently was being entertained. Plaintiff had a colonoscopy scheduled in two weeks. His current pain rating was 7/10, with the least severe being 4/10 and the most severe being 10/10 since his last visit. He felt better lying down, after taking medications, and when he used ice or heat on the affected area. He felt worse bending or lifting. Dr. Guarino noted that plaintiff's mobility was independent and antalgic. Percocet provided partial relief with no side effects, but Oxycontin provided no relief. He reported only sleeping two hours per night because of the pain. Since plaintiff's list visit, he stated that he had had less of an appetite and stomach irritation. Dr.

Guarino planned on trying an opioid rotate, consisting of a trial of Exalgo[1] and continuation of Percocet. Reevaluation was scheduled in three months.

A report from plaintiff's scheduled colonoscopy on December 12, 2012 noted that internal hemorrhoids were found but were small. Normal mucosa was found in the entire colon and the terminal ileum appeared normal, but biopsies were taken for histology. The biopsies found no histopathologic abnormality in the terminal ileum and melanosis coli with no evidence of lymphocytic or collagenous colitis in the colon.

At his next appointment with Dr. Guarino on February 11, 2013, plaintiff reported pain in his lower back, on both sides of his hips, in his left mid-abdomen, neck, and head. (Tr. 409–12). Plaintiff stated that his symptoms had increased over the last few months, but he did not know why. The pain worsened when he was on his feet, improved when he was lying down, and did not respond to heat or ice. His current pain rating was 8/10, with the least severe being 6/10 and the most severe being 10/10 since his last visit. Oxycodone provided partial relief, but Exalgo provided no reported relief. Plaintiff's mobility was noted as independent and normal. He was not engaging in a home exercise program, in contrast to his report from the last visit. With respect to his history of smoking, plaintiff reported that he quit on November 5, 2012. His physical examination was normal. Dr. Guarino assessed plaintiff with lumbosacral spondylosis and abdominal pain. The doctor discussed options for plaintiff's low back pain, including physical therapy, medications, and injections. Plaintiff did not think he could do physical therapy since he felt it would increase his abdominal pain. Dr. Guarino planned to try

lumbar facet injections and increased plaintiff's prescription for Exalgo from 32 mg to 40 mg daily.

At his pain management appointment with Dr. Guarino on February 20, 2013, plaintiff reported that the increased dosage of Exalgo was ineffective. (Tr. 413–17). He stated that nothing improved his pain, and any movement made it worse. The pain severely interfered with his sleep, general activity and normal work, but did not affect his ability to concentrate. Dr. Guarino gave plaintiff lumbar facet injections as planned in six locations of his back. The total amount of steroid injected was 80 mg methylprednisolone.[28] The doctor planned to repeat the injections as needed in two weeks.

At his next appointment with Dr. Guarino on March 6, 2013, plaintiff reported good (75%) but short-lived (one week) relief from the lumbar facets. (Tr. 418–22). His current pain rating was 6/10. He reported partial relief from Exalgo and Oxycodone with no side effects. Dr. Guarino provided plaintiff another set of lumbar facet injections consisting of 80 mg methylprednisolone. Plaintiff tolerated the procedure well with no complications. Dr. Guarino planned to repeat the lumbar facets as needed and reevaluate plaintiff in two months.

On April 17, 2013, plaintiff told Dr. Guarino that the last lumbar facets gave him 50% relief for two weeks. (Tr. 423–27). He rated his current pain as 9/10 with the least severe since his last visit being 4/10 and the most severe being 10/10. The pain was described as aching, burning, numbing, shooting, throbbing, stabbing, sharp and constant. The pain was improved by pain medications, heat and ice, and worsened by activity. Plaintiff's mobility was independent and normal

---

[28] Methylprenisolone is a corticosteroid used to relieve inflammation.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601157.html (last visited August 13, 2015).

and his gait was steady. Both Exalgo and Oxycodone gave partial relief with no side effects. Dr. Guarino gave plaintiff more lumbar facet injections with a total of 80 mg methylprednisolone. His pain intensity was 10/10 before the procedure and 8/10 after. Reevaluation was scheduled in six weeks.

Dr. Guarino completed a Medical Source Statement for plaintiff on July 18, 2013. (Tr. 428–29). The doctor wrote that plaintiff was unable to lift, stand, walk, push or pull for any amount of time in an 8-hour work day. Plaintiff could sit for four hours for 30 minutes at a time in an 8-hour work day. Dr. Guarino opined that plaintiff should assume a reclining position for 60 minutes every 30 minutes a day, and assume a supine position for 60–120 minutes every 30 minutes a day. Plaintiff could never bend, kneel, reach, handle and only occasionally finger. Plaintiff could not work in environments with heights, machinery, temperature extremes, fumes, or vibrations. Dr. Guarino wrote that he based his findings on the fact that plaintiff had increased pain with lifting dishes at home. A CT scan of plaintiff's chest and abdomen on October 10, 2013 indicated that plaintiff had had a cholecystectomy, a Nissen fundoplication with a small hiatal hernia, fatty liver, and few scattered pulmonary opacities in the right upper lobe of his chest that could relate to a resolving infection or inflammation. (Tr. 431).

### III. The ALJ's Decision

In the decision dated April 25, 2013, the ALJ made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2016.

2. Plaintiff has not engaged in substantial gainful activity since July 9, 2011, the alleged onset date.

3.   Plaintiff has the following severe impairments: gastroesophageal reflux disease status post laparoscopic redo hiatal hernia repair and Nissen fundoplication with lipid barrier coated mesh.

4.   Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b), except he is able to occasionally bend and frequently reach and kneel.

6.   Plaintiff is unable to perform any past relevant work.

7.   Plaintiff was born on March 13, 1981 and was 30 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date.

8.   Plaintiff has at least a high school education and is able to communicate in English.

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled," whether or not plaintiff has transferable job skills.

10.  Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11.  Plaintiff has not been under a disability, as defined in the Social Security Act, from July 9, 2011 through the date of the ALJ's decision.

(Tr. 16–32).

## IV.   Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson

v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A);  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520;  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five.  Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations."  Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may

cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner, 646 F.3d at 558 (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. **Discussion**

Plaintiff challenges the ALJ's RFC determination, arguing that the ALJ improperly rejected additional limitations supported by the record, including treating source opinions consistent with plaintiff's claims, and improperly discounted plaintiff's credibility. A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). The ALJ, however, "is

not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians." Id. at 927 (citation omitted). Furthermore, "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. at 923. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

The ALJ found that plaintiff had the severe impairment of GERD with the status of post-laparoscopic redo hiatal hernia repair and Nissen fundoplication with a lipid barrier coated mesh. After considering the entire record, the ALJ concluded that plaintiff had the RFC to perform light work, except that he is able to occasionally bend and frequently reach and kneel. In determining plaintiff's RFC the ALJ considered plaintiff's statements and allegations of pain as asserted in his disability application documents and at his hearing. (Tr. 22–23). The ALJ found that plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible. The ALJ wove her credibility analysis into the RFC determination, highlighting the inconsistencies in the record. (Tr. 22–26); see Smith v. Colvin, 756 F.3d 621, 625 (8th Cir. 2014) ("We defer to the ALJ's evaluation of [a claimant's] credibility, provided that such a determination is supported by good reasons and substantial evidence even if every factor is not discussed in depth.") (internal quotations and citations omitted).

In evaluating a plaintiff's credibility, an ALJ is required to consider (1) the claimant's daily activities, (2) the duration, frequency and intensity of the pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness and side effects of

medication, and (5) functional restrictions. Polaski v. Heckler, 439 F.2d 1320, 1322 (8th Cir. 1984). The ALJ "need not explicitly discuss each Polaski factor," however. Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (citing Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004)). The ALJ "only need acknowledge and consider those factors before discounting a claimant's subjective complaints." Id.

The first cited basis for the ALJ's RFC finding and discredit of plaintiff's allegations was the conservative or routine treatment that plaintiff received for his conditions. As noted by the ALJ and the summary of plaintiff's medical history above, the records show that plaintiff only saw both his pain management doctor and gastroenterologist every six weeks to three months despite his allegations of disabling pain. (Tr. 25). The treatment plaintiff received after the alleged onset date also was relatively conservative in nature, consisting of pain medication and injections. See Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (noting that a record of conservative treatment is a proper consideration when discrediting a claimant's subjective complaints of pain).

Second, the findings of objective medical testing after his hiatal hernia repair and fundoplication, including endoscopies, esophagrams, biopsies, an MRI, and a colonoscopy, were all benign. See 20 C.F.R. § 404.1529(c)(2) (stating that objective medical evidence obtained from medically acceptable clinical and laboratory diagnostic techniques "is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work"). Also, clinical observations of plaintiff's gait, strength and movements and physical

examinations of his systems were routinely normal. After recovering from his hiatal hernia repair and redo fundoplication, Dr. Brunt released plaintiff to full work duty in July 2011 based on recent normal test results. (Tr. 23, 202). In June 2012, plaintiff admitted to Dr. Guarino that he was pursuing a home exercise program, including stretching, walking, and riding a bike. (Tr. 24, 349–52).

Third, the ALJ carefully noted the inconsistencies between plaintiff's statements and the record. When a wrap herniation appeared in plaintiff's initial fundoplication that required a redo hiatal hernia repair and fundoplication to reinforce the crural closure with a lipid barrier coated mesh in early 2011, Dr. Brunt advised plaintiff to quit smoking to help his healing and avoid any further complications in the future. (Tr. 204–05). However, treatment notes indicated that plaintiff continued to smoke at least through August 2011 and additional records later showed that plaintiff was still smoking as late as May 2012. (Tr. 25, 216–29, 409–12); see Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility."). Additionally, at the hearing plaintiff testified that he was unable to eat much because of the pain in his stomach and back, but doctor's notes continuously indicated that plaintiff's weight was stable and he was having regular bowel movements. (Tr. 25, 51, 204–05, 245–46, 252–55, 363–77). Although he alleged significant nerve damage in his stomach from his surgeries at the hearing, plaintiff has never been diagnosed with nerve damage or underwent neurologic testing. (Tr. 25, 47–49). When he began receiving steroid injections for his pain, his reports about pain relief were inconsistent across appointments. (Tr. 25, 341–48, 413–22).

Finally, the ALJ noted that plaintiff's daily activities and abilities suggested his pain was not as limiting as alleged. (Tr. 22, 26). Plaintiff admitted that he was able to manage his personal care independently, take medications without reminders, drive a vehicle, shop for groceries with his wife, manage finances, do light house chores, get along with others, pay attention for as long as necessary, follow instructions, handle stress and cope with changes in routine. See 20 C.F.R. § 404.1529(c)(3) (stating that the information a claimant provides about his pain, including how the symptoms affect the claimant's daily living activities, is an important indicator of the intensity and persistence of alleged symptoms). Accordingly, good reasons and substantial evidence supports the ALJ's credibility analysis of plaintiff's testimony.

As to the ALJ's rejection of Dr. Sharabash's opinion in the medical source statement she provided upon plaintiff's request, the ALJ noted that the opinion was provided after plaintiff had only one appointment with the doctor. (Tr. 26, 360–61). The ALJ noted that Dr. Sharabash's assessments were inconsistent with the findings in the record, including plaintiff's own function report and Dr. Guarino's observations of plaintiff's normal strength and gait. See Goff, 421 F.3d at 790–91 ("[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount the opinion."). Furthermore, the ALJ concluded that Dr. Sharabash's opinion did not deserve any weight because the doctor acknowledged in the medical source statement that the noted limitations were based on plaintiff's own description of his abilities rather than objective tests conducted. See Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) ("The ALJ was entitled to give less

weight to [the doctor's] opinion, because it was based largely on [claimant's] subjective complaints rather than on objective medical evidence.").

The additional evidence plaintiff submitted to the Appeals Council after the ALJ issued her decision does not undermine the substantial evidence supporting the ALJ's decision. The additional medical records presented, which consist largely of pain management appointments with Dr. Guarino, were cumulative to evidence already in front of the ALJ. Additionally, the medical source statement provided by Dr. Guarino in July 2013 was markedly inconsistent with the benign objective tests and clinical observations, including his own, throughout the record. (Tr. 428–29); see Davidson v. Astrue, 501 F.3d 987, 991 (8th Cir. 2007) (holding that because the record contained good reasons to reject the medical opinions submitted to the Appeals Council, including the fact that the treating physician's opinion was inconsistent with other evidence, "the new evidence did not undermine the ALJ's decision"). Dr. Guarino, liked Dr. Sharabash, acknowledged that he based his findings of plaintiff's limitations on plaintiff's subjective reports, rather than objective tests or his own observations.

Because the ALJ's RFC determination is consistent with the type and level of treatment plaintiff sought and received, medical observations and objective test results, and his surgeon's release to full work duty shortly after the alleged onset date of his disability, substantial evidence in the record supports the ALJ's RFC finding. See Travis v. Astrue, 477 F.3d 1037, 1040 (8th Cir. 2007) ("If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome.").

## VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 7th day of March, 2016.